IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


DAVID D. HAAS, *et al.*,            :

        Plaintiffs,            :

                                        Case No. 3:07cv139

            vs.            :

                                        JUDGE WALTER HERBERT RICE

BEHR DAYTON THERMAL            :

PRODUCTS, LLC

                                    :

        Defendant.


---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (DOC. #19); OVERRULING
DEFENDANT'S MOTION TO DISMISS AND ALTERNATIVE MOTION
FOR COSTS (DOC. #33); REJECTING MAGISTRATE JUDGE'S
SUBSTITUTED REPORT AND RECOMMENDATIONS (DOC. #39);
SUSTAINING PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE
JUDGE'S SUBSTITUTED REPORT AND RECOMMENDATIONS (DOC.
#40); AND OVERRULING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (DOC. #45-2); CONFERENCE CALL SET

---

        Twenty-one named Plaintiffs filed suit against Defendant Behr Dayton

Thermal Products, LLC ("Behr"), alleging violations of both the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. §§ 201-219, and the Ohio Minimum Fair Wage Standards

Act ("OMFWSA"), Ohio Rev. Code Ann. §§ 4111.01-.17. Doc. #1. The crux of

the Plaintiffs' Complaint is that Behr has failed to pay them overtime, as required by both the Federal and Ohio Acts.

Behr has moved to dismiss the Plaintiffs' state law claims, under Federal Rule of Civil Procedure 12(b)(1), arguing that the Court should decline to exercise supplemental jurisdiction over these claims. Doc. #33. Behr bases its argument primarily on the fact that the Plaintiffs originated their claims in state court, voluntarily dismissed the claims, and then refiled, along with the FLSA claims, in the form of the present litigation. Id. Behr also moves for reimbursement for the costs it incurred in defense of the state court action. Id. In response to Behr's Motion, the Magistrate Judge issued a Substituted Report and Recommendations, wherein he recommended that the Court decline to exercise supplemental jurisdiction over the state law claims and did not reach the question of costs. Doc. #39. Subsequently, the Plaintiffs have objected to the Magistrate Judge's Substituted Report and Recommendations and Behr has responded. Docs. #40, #42.

Behr has also moved the Court for partial summary judgment (Doc. #19), as to the claims of three of the Plaintiffs - - - David D. Haas (a level 2 maintenance supervisor), Jerry L. Cromer (a level 3 production supervisor) and Fred H. Shock (a level 2 production supervisor). Behr's primary contention is that the Plaintiffs are exempt from the overtime provisions of the FLSA and the corresponding Ohio law, because they are salaried "executive" employees or, alternatively, because they are

2

"administrative" employees. Id.  The Plaintiffs have also moved for partial summary

judgment, as to these same three Plaintiffs. Doc. #45-2.

On September 30, 2008, this Court entered a Decision and Entry (Doc.

#75), overruling Defendant's Motion for Partial Summary Judgment, with

expanded opinion to follow.  Upon further study and reflection, the Court now

sustains the Defendant's Motion for Partial Summary Judgment, based on the

reasoning and citations of authority set forth below.

The Court will begin its analysis with a discussion of the merits of Behr's

Motion to Dismiss the Plaintiffs' state law claims and alternative Motion for Costs.

It will then turn to a review of the parties' Motions for Partial Summary Judgment.


I.      FACTS[1]

The Court will now give a brief recitation of the background facts to the

present dispute.  A more thorough presentation of the facts pertinent to each of

_____

        [1]This Decision addresses both the Defendant's Motion for Partial Summary
Judgment (Doc. #19) and that of the Plaintiffs' (Doc. #45-2).  When ruling on the
Defendant's Motion, the Court will consider the facts and circumstances giving rise
to such Motion in the manner most favorable to the Plaintiffs, as the party against
whom the Motion is directed and, conversely, when ruling on the Plaintiffs'
Motion, the Court will consider the facts and circumstances giving rise to such
Motion in the manner most favorable to the Defendant. Servo Kinetics, Inc. v.
Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

the issues before the Court will be set forth within the applicable discussions below.

The Behr facility at which the Plaintiffs are employed manufactures engine heating and cooling systems for the automotive industry. Doc. #1 (Compl.) ¶ 10. Chrysler and then Daimler Chrysler previously owned and ran the facility. Id. ¶ 11. At some point in time prior to October, 2002, Behr entered into a joint venture with Daimler Chrysler to operate the facility and then, as of May, 2004, Behr became its sole owner. Doc. #33, Ex. A (Stephenson Aff.) ¶ 8.

Prior to October, 2002, supervisors received their stated salaries plus one and one-half times their hourly rate for hours worked in excess of forty hours per week. Doc. #1 (Compl.) ¶ 12. Beginning in October, 2002, Behr eliminated overtime payments for certain supervisors, including level 3 production supervisor Cromer. Beginning in July, 2003, Behr began eliminating overtime pay for other supervisors, to include level 2 production supervisor Shock and level 2 maintenance supervisor Haas. Id. ¶ 18.

Cromer's base compensation for 2002 was $81,000 and his overtime earnings were $19,154 (total compensation $100,154). Doc. #50 (Cromer Aff.) ¶ 24. From and after January, 2003, Cromer received straight compensation, with no additional overtime payments. Doc. #19, Ex. 19 (Behr Memo., dtd. June 30, 2003). As job level 2 supervisors, both Haas and Shock continued to receive overtime payments throughout 2003, in addition to their base compensations - -

Haas receiving $59,947 plus $18,747 (total compensation of $78,694) (Doc. #48 (Haas Aff.) ¶ 42) and Shock receiving $83,586 plus $27,525 (total compensation $111,111) (Doc. #49 (Shock Aff.) ¶ 37).  By April, 2004, however, Behr had converted both Haas and Shock to the straight annualized compensation system, with no additional payments for overtime. Doc. #33, Ex. A (Stephenson Aff.) ¶ 16. As a part of this conversion, Haas received a one-time "roll-in" salary adjustment to $70,000. Id.

II.     MOTION TO DISMISS/MOTION FOR COSTS

The Defendant has moved to dismiss the Plaintiffs' state law claims for lack of jurisdiction and for costs incurred in defending the prior state court action. Doc. #33.  The Court will first address the Motion to Dismiss, followed by a discussion of the Motion for Costs.

A.     Motion to Dismiss

This Court has subject matter jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, since those claims are based on federal law.  As to their state law claims, the Plaintiffs assert that supplemental jurisdiction is appropriate under 28 U.S.C. § 1367, since those claims are part of the "same case or controversy" as the federal claims. Doc. #1 ¶ 2.

28 U.S.C. § 1367 provides that in any civil action where a district court has original jurisdiction, the court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Courts may decline to exercise supplemental jurisdiction over a claim, however, if:

    (1)    the claim raises a novel or complex issue of State law,

    (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3)    the district court has dismissed all claims over which it has original jurisdiction, or

    (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

In its Motion to Dismiss, the Defendant does not argue that the Plaintiffs' state law claims are not part of the "same case or controversy" as their federal claims.  Rather, it argues that the state law claims should be dismissed because: (1) they presents "novel questions of state law" that should not be litigated in the first instance in federal court; (2) they substantially predominate over the FLSA claims; and (3) Plaintiffs' forum shopping presents an exceptional circumstance and compelling reason to decline supplemental jurisdiction. Doc. #33.  The Magistrate

Judge recommended that the Defendant's Motion to Dismiss be sustained, based primarily on the Plaintiffs' first and third arguments.[2] Doc. #39.

### 1.   Novel Issue of State Law

In a footnote in its memorandum in support of its Motion to Dismiss, the Defendant asserts that the resolution of the state law claims involves "novel" state law issues, which this Court should not decide, to wit:  whether Ohio's newly amended three year statute of limitation applies to this case and, likewise, whether Ohio's new double damages provision so applies. Doc. #33 at 15 n.16 (citing Ohio Rev. Code Ann. §§ 4111.10; 4111.14(K)-(J)).

Although the Court recognizes that resolution of the state law claims may involve a decision about the application of the Ohio Revised Code's newly enacted provisions regarding the statute of limitations and/or damages, it respectfully disagrees with the Magistrate Judge's conclusion that the Court should decline to exercise supplemental jurisdiction over the state claims for this reason.  Rather, the Court concludes that Ohio courts have addressed the broad issues pertaining to the application of statutes of limitations and damages such that the newly enacted

_____

[2]The Magistrate Judge agreed with the Defendant's second argument (that the Plaintiffs' state law claims substantially predominate over their FLSA claims) only to the extent that the Plaintiffs may be entitled to a longer statute of limitations on their state claims than on their FLSA claims. Doc. #39 at 5. However, the Magistrate Judge recognized that most of the questions of law attendant to the state claims are the same under both the Ohio and federal statutes. Id.

Code sections pertaining to these two issues are not so novel that the concerns for federalism outweigh the concern for judicial economy, in this case. Contrast Drew v. University of Tenn. Reg'l Med. Ctr. Hosp., 2000 U.S. App. LEXIS 8936, *14 (6th Cir. May 1, 2000) (finding that "the duty of care owed a patient by a medical student" presented a novel question of state law); Richard v. Oak Tree Group, Inc., 2008 U.S. Dist. LEXIS 10369, *25-26 (W.D. Mich. Feb. 12, 2008) (finding that new statutory cause of action regarding licensees' miscommunication with debtors was novel question of state law).

      2.      Whether State Claims Substantially Predominates over Federal Claims

The Sixth Circuit recognizes that "the [OMFWSA] expressly incorporates the standards and principles found in the FLSA." Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 501 (6th Cir. 2007). Thus, even though a plaintiff may assert an overtime claim under both federal and state law, in general, "[courts] need consider only federal law." Id.

While recognizing the Sixth Circuit's stance on this point, the Defendant nevertheless argues that the Plaintiffs' state law claims predominate "based upon the [Plaintiffs' anticipated] emphasis on the state law statute of limitations."[3] Doc.

---

[3]The Defendant anticipates the Plaintiffs' raising this argument, in particular, with regard to five of the Plaintiffs who are not subject to the Motion for Partial Summary Judgment that is presently before the Court, to wit: Ronald Travis, Elgin

#33 at 16.  The Court disagrees.  Given the Sixth Circuit's recognition that the OMFWSA incorporates the general standards and principles found in the FLSA, the assertion that the parties might disagree on the application of the state law statute of limitations, or the possibility that the two Acts may contain different statutes of limitations, is not sufficient to override the similarity of the other provisions in the two Acts and the Court's focuses on the FLSA, in deciding this case. E.g., Thomas, 506 F.3d 496.  Thus, the Court will not decline supplemental jurisdiction over the state law claims, on this basis.

### 3.    Exceptional Circumstances - Forum Shopping

As its final argument, the Defendant asserts that this case presents an "exceptional circumstance" and, thus, the Court should decline to exercise supplemental jurisdiction.  The "exceptional circumstance" urged by the Defendant is the Plaintiffs' alleged forum shopping.

As was previously noted, the Plaintiffs originally filed a lawsuit in state court, asserting violations of the overtime provisions of the OMFWSA - - - basically the same claim that comprises Count II of their present Complaint. Doc. #33, Ex. B (Montgomery Cty. Comm. Pleas Court Compl., filed Jan. 27, 2005).  In that litigation, the three named Plaintiffs (Haas, Cromer and Shock) brought the action

---

Kight, Clarence Bishop, Bernard Brown and Vernon Graves. Doc. #33 at 16.  The Defendant asserts that these Plaintiffs' claims are barred (or "nearly barred", in the case of Bishop and Brown), under the federal statute of limitations. Id.

on behalf of themselves and a class comprised of "all persons employed by [Behr] as non-bargaining unit (NBU) employees in Job Levels 1,2, and 3 at any time during the period October 1, 2002 to the present whose overtime pay was eliminated by Behr." Doc. #33, Ex. C (Montgomery Cty. Comm. Pleas Court Decision, dtd. Mar. 30, 2006) at 2 (noting revision of class definition, as originally stated in Complaint). The Common Pleas Court ultimately overruled the Plaintiffs' Motion for class certification, finding that the claims of the proposed class were not typical and that questions of law and fact that were common to the class did not predominate over questions affecting only individual members of the class, as required by Ohio law. Id. at 12.

The Plaintiffs appealed this decision to the Ohio Second District Court of Appeals, which affirmed the trial court's refusal to certify the class action. Doc. #33, Ex. D (Ohio 2nd App. Dist., dtd. Feb. 9, 2007). The Plaintiffs then voluntarily dismissed their claim.[4] Doc. #33, Ex. E (Not. Vol. Dismissal, dtd. Mar. 12, 2007). Approximately one month later, the Plaintiffs filed the action that is presently before this Court, which differs from the previous action in the following manner: (1) the new Complaint names twenty-one Plaintiffs, as opposed to three; (2) it is not a class action; and (3) it adds the FLSA claim. Doc. #1 (Compl., dtd. Apr, 11, 2007).

---

[4]Subject to certain provisions, the Ohio Civil Rules allow a plaintiff to voluntarily dismiss a suit, without prejudice, without agreement of the other party or judicial approval. Ohio Civ. R. 41(A).

While courts generally discourage forum shopping, e.g., Preferred Capital, Inc. v. Sarasota Kennel Club, Inc., 489 F.3d 303, 308 (6th Cir. 2007) (recognizing that one of the aims of the Erie rule is the "discouragement of forum-shopping"), the Court respectfully disagrees with the Magistrate Judge's conclusion, in this case, that the Plaintiffs' refiling in this Court "was plainly an exercise in forum shopping." Doc. #39 at 4. In a previous, similar alleged forum shopping case, the Sixth Circuit's focus was on whether the plaintiff "suffered setbacks in one court and dismiss[ed] to try [her] luck somewhere else." Rogers v. Wal-Mart Stores, Inc., 230 F.3d 868, 874 (6th Cir. 2000) (quotation omitted). The Appellate Court concluded that the plaintiff in that case did just that, in that she refiled her case only after missing a court deadline for disclosing expert witnesses. Id.

Although in this case the Plaintiffs did suffer a "setback" in the state court, that setback had nothing to do with the merits of their claims, under either state or federal law. The state court merely dealt with the class action issues, which are not relevant to the present litigation. The state court never reached the merits of the Plaintiffs' claims.[5] Therefore, the Plaintiffs did not gain any tactical advantage

---

[5]Thus, the Court finds that the Defendant goes too far in its assertion that the Plaintiffs are "attempt[ing] to re-litigate their prior claim in federal court after the state court action proceeded in what they considered an unfavorable direction." Doc. #33 at 9. According to the information provided to this Court, the only thing litigated in the prior action was the class action issue, which is not part of the present litigation.

by dismissing and refiling their suit with this Court.[6]  As the Plaintiffs correctly contend, "[t]here is no reason to believe that the state court would have ruled against Plaintiffs['] wage and hour claims, just because the state court decided that Plaintiffs were not entitled to certification of the case as a class action." Doc. #40 at 1-2.

Given that the Plaintiffs' state law claims are clearly part of the "same case or controversy" as their federal claims and because the Court is not persuaded that any of the statutory factors set forth in  28 U.S.C. § 1367(c) weigh in favor of its declining to exercise supplemental jurisdiction over the Plaintiffs' state law claims, the Defendant's Motion to Dismiss (Doc. #33) is OVERRULED, the Magistrate Judge's Substituted Report and Recommendations thereon (Doc. #39) is respectfully REJECTED, and the Plaintiffs' objections thereto (Doc. #40) are SUSTAINED.

B.    Motion for Costs

The Defendant also moves for costs associated with defending the state

_____

[6]The Court does not understand the Plaintiffs' argument that they refiled their case in federal Court, in order to exercise a "valid, tactical choice" regarding "the relevant limitations period." Doc. #12 at 7-8.  There does not appear to be any reason why the Plaintiffs could not have dealt with the "relevant limitations period" question in state court.  Nevertheless, as explained above, the Court concludes that the Plaintiffs were not forum shopping by refiling their case in this Court.

court action. Doc. #33.  In so doing, it relies on Federal Rule of Civil Procedure

41(d), according to which,

> If a plaintiff who previously dismissed an action in any court files an
> action based on or including the same claim against the same
> defendant, the court:
>
> (1)   may order the plaintiff to pay all or part of the costs of that
>       previous action; and
>
> (2)   may stay the proceedings until the plaintiff has complied.

Fed. R. Civ. Proc. 41(d).  The Defendant urges the Court to use its discretion to

impose costs under this Rule, implying that it "in essence has had to defend the

present suit twice." Doc. #33 at 19 (quoting Hython v. City of Steubenville, 1996

U.S. App. LEXIS 22264, *6 (6th Cir. Aug. 12, 1996)).  The Defendant then points

to 28 U.S.C. § 1920 to identify the types of costs to which it is purportedly

entitled,[7] and attaches an itemized list of the costs it incurred in defending the prior

state action, totaling $13,028. Id. at 19-20; Doc. #33, Ex. J (list of costs).

---

[7]The Defendant asserts that it is entitled to the following costs, all of which
are allowable under 28 U.S.C. § 1920:

> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic
>     transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained
>     for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts . . . .

Doc. #33 at 19-20.

The Sixth Circuit instructs that Rule 41(d) is meant to prevent both "vexatious litigation" and "forum shopping." Rogers v. Wal-Mart Stores, Inc., 230 F.3d 868, 874 (6th Cir. 2000) (citing Robinson v. Nelson, 1999 U.S. Dist. LEXIS 2004, at *2 (D. Mass. Feb. 18, 1999)). As to the forum shopping deterrent, the Court states, "Rule 41(d) is . . . intended to prevent attempts to 'gain any tactical advantage by dismissing and refiling the suit.'" Id. (quoting Sewell v. Wal-Mart Stores, Inc., 137 F.R.D. 28, 29 (D. Kan. 1991)).

As previously discussed, there is no indication that the Plaintiffs were forum shopping when they voluntarily dismissed their state court action and filed the present Complaint. Further, the Defendant points to no evidence to indicate that the Plaintiffs had a "vexatious intent" when they took such steps. The Court is also not persuaded by the Defendant's assertion that they have had to, in essence, defend the present suit twice, given that the state court action centered primarily on class action certification, which is not at issue in the present litigation. Again, unlike in this litigation, the prior state court action did not require the Defendant to defend against the merits of the Plaintiffs' state law claims. Thus, the Court OVERRULES the Defendant's Motion for Costs. Doc. #33.


III. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Both parties have moved the Court for summary judgment, as to the claims of Plaintiffs Haas, Cromer and Shock. Doc. #19 (Pls.' Summ. J. Mot.); Doc. #45-2

(Def.'s Summ. J. Mot.).  The Court will begin with a discussion of the standard for resolving motions for summary judgment, followed by a review of the substantive law and an application of that law to the facts before it.

A.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining

16

whether there is a genuine issue of material fact), "[a] district court is not . . .

obligated to wade through and search the entire record for some specific facts that

might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889

F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S.

Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v.

Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . ."). Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

attention by the parties.


    B.    <u>Overtime Provisions of FLSA/OMFWSA</u>

In its Motion for Partial Summary Judgment, the Defendant's contention is

that the Plaintiffs are exempt from the overtime provisions of the FLSA and the

OMFWSA, because they are salaried "executive" employees or, alternatively,

because they are "administrative" employees. Doc. #19. Conversely, the Plaintiffs

argue that they are not exempt from the Acts' overtime pay provisions as either

salaried "executive" or "administrative" employees and, thus, the Defendant's

failure to pay them overtime violates both of the Acts. Doc. #45-2.

As previously noted, the Sixth Circuit has recognized that "the [OMFWSA] expressly incorporates the standards and principles found in the FLSA" and, thus, even though a plaintiff may assert an overtime claim under both federal and state law, in general, "[courts] need consider only federal law." Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 501 (6th Cir. 2007). Therefore, the Court will focus its attention on the FLSA, except as necessary to address any differences that may be present in the two Acts.

According to the FLSA, employers are generally not allowed to employ a worker who is engaged in, among other things, the production of goods for commerce "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Not all workers are covered by this provision, however. Among others, Congress exempted from the reach of the overtime provisions workers who are employed in a "bona fide executive [or] administrative . . . capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary." 29 U.S.C. § 213(a)(1).

As to the burden of proving these exemptions, "[t]he employer bears the burden of showing that [an] exemption applies to the employee[], and exemptions are to be narrowly construed in order to further Congress's goal of providing broad

federal employment protection." <u>Michigan Ass'n of Govn. Employees v. Michigan Dep't of Corr.</u>, 992 F.2d 82, 83 (6th Cir. 1993) (citing <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196-97, 94 S. Ct. 2223 (1974), <u>Mitchell v. Lublin, McGaughy & Associates</u>, 358 U.S. 207, 211, 79 S. Ct. 260 (1959)).  Further, "[t]he defendant must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption." <u>Thomas</u>, 506 F.3d at 501 (quoting <u>Ale v. TVA</u>, 269 F.3d 680, 691 n.4 (6th Cir. 2001)).

The first prerequisite an employer must satisfy to show that an employee is exempt from the overtime provisions as either a "bona fide executive" or "bona fide administrative" employee is that the employee is "[c]ompensated on a salary basis at a rate of not less than $ 455 per week." 29 C.F.R. § 541.100(a)(1); 29 C.F.R. § 541.200(a)(1).  Once the salary requirement is met, in order to show that the employee is a bona fide <u>executive</u>, the employer must set forth proof that the employee:

> (1) Has a primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

> (2) Customarily and regularly directs the work of two or more other employees; and

> (3) Has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a)(2)-(4). Once the employer establishes the salary requirement, in order to demonstrate that an employee is a bona fide <u>administrative</u> employee, the employer must show that the employee:

> (1) Has a primary duty of performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

> (2) Has a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(2)-(3). The Court will first consider the specifics of the "salary" requirement and then look at the remaining parameters pertaining to bona fide executive and administrative employees.

### 1. <u>Salary Requirements Pertinent to Overtime Exempt Status</u>

As previously stated, in order to satisfy both the bona fide executive and administrative requirements, the employer must show that the employee is "[c]ompensated on a salary basis at a rate of not less than $ 455 per week." 29 C.F.R. § 541.100(a)(1); 29 C.F.R. § 541.200(a)(1). There is no question that the

three employees in question, in the Motion before the Court, are compensated well in excess of $455 per week. Thus, the only question is whether that compensation is made on a "salary basis". The regulations provide that an employee will generally be considered to be paid on a "salary basis" if:

> [T]he employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to [some exceptions not applicable in the present case], an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work. An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

29 C.F.R. § 541.602(a). The parties do not dispute that Behr paid the Plaintiffs in accordance with the terms of this provision. Rather, the Plaintiffs argue that their situation presents exceptions to this general rule, for reasons the Court will now more fully explore.

The Plaintiffs present three arguments as to why they were not paid on a "salary basis", to wit: (1) the Defendant required the Plaintiffs to take their vacations during plant shutdowns; (2) their guaranteed base compensation did not bear a "reasonable relationship" to their actual weekly compensation, which

included substantial overtime pay;[8] and (3) Haas and Shock always worked in excess of forty hours per week and, thus, always earned overtime pay, so their compensation directly corresponded to the number of hours they worked as opposed to corresponding to their base compensation. Doc. #45-2 at 38-39; Doc. #74-3 at 2-3.[9] As legal support for these arguments, the Plaintiffs cite Michigan Association of Government Employees v. Michigan Department of Corrections, 992 F.2d 82, 84 n.3 (6th Cir. 1993) (pertaining to argument that salaried employee's base compensation must be "reasonably related" to actual compensation), Borda v. Sandusky Ltd., 166 Ohio App. 3d 318, 850 N.E.2d 766 (Ohio 6th App. Dist. 2006) (supporting all three arguments) and Acs v. Detroit Edison Co., 444 F.3d 763 (6th Cir. 2006) (regarding assertion that salaried employee's pay must correspond to base compensation, rather than hours worked).

The Defendant's response is three-fold. First, it asserts that the assumption made in the case primarily relied upon by the Plaintiffs, Borda v. Sandusky Ltd.,

_____

[8]In their memorandum in support of their Motion for Partial Summary Judgment, the Plaintiffs point to evidence that supports their assertion that, using figures from 2003, Haas's base compensation of $59,947 was 76% of his total compensation (including overtime pay) of $78,694; Cromer's base compensation of $81,000 was 81% of his total compensation of $100,154; and Shock's base compensation of $83,586 was 75% of his total compensation of $111,111. Doc. #45-2 at 38-39. In their reply memorandum, however, Plaintiffs state that Haas's base compensation was 62% of his total compensation. Doc. #74-3 at 5. It is unclear why they changed the percentage in their later memorandum.

[9]Plaintiffs also cite the "Wage and Hour Division Field Operations Handbook" which they state is attached to their memorandum as Exhibit D, but no such Handbook is attached.

about the mandatory use of available vacation during a plant shutdown, is at odds with a DOL enforcement policy covering the same. Doc. #67 at 3-4. Next, the Defendant contends that the payroll data the Plaintiffs rely on from 2003 is from a time period outside of the FLSA two-year statute of limitations, and that during the proper limitations period, the Plaintiffs received only an annualized salary. Id. Finally, the Defendant asserts that Borda was based on pre-2004 FLSA regulations and the new regulations clarify that the "reasonable relationship" requirement only applies if the employee's pay is computed on an "hourly, daily or shift basis," which is not the case here. Id. As legal support for its argument, the Defendant points to 29 C.F.R. § 541.604(b) (regarding the "reasonable relationship" requirement) and 1994 WL 1004841 (DOL Opinion Ltr, dtd. June 16, 1994) (pertaining to vacations during plant shutdowns).

To counter the Defendant's argument pertaining to vacations during plant shutdowns, the Plaintiffs present a rather circular argument, asserting that the 1994 DOL Opinion Letter relied upon by the Defendant is predicated on the assumption that the employees are exempt and does not address whether requiring employees to take vacations during plan shutdowns is characteristic of nonexempt status. Doc. #74-3 at 6-7. As to the Defendant's assertions pertaining to the Borda case's inapplicability, the Plaintiffs argue that their overtime pay was calculated on an hourly basis, making the Borda holding applicable to their situation. Id. at 5 n.3.

a.    <u>Mandatory Vacation During Plant Shutdown</u>

As the Plaintiffs suggest, the Ohio Appellate Court, in <u>Borda v. Sandusky Ltd.</u>, considered the mandatory vacation policy during plant shutdowns as one factor in determining that the employees were not exempt from the overtime provisions of the FLSA and OMFWSA. <u>Borda</u>, 166 Ohio App. 3d at 324 ("As further evidence that appellees' status was more consistent with hourly, rather than salary, work, we look to appellant's treatment of appellees during the Christmas shutdown.").  However, this Court concludes that the courts that have arrived at the opposite conclusion more properly base their decisions on the sections of the applicable regulations.

For example, in <u>Cooke v. General Dynamics Corp.</u>, 993 F. Supp. 50 (D. Conn. 1997), the District Court was faced with the same question regarding mandatory vacation time.  In determining that the policy mandating vacations during plant shutdowns did not cause an employee to lose his overtime exempt status, the Court focused on the following portion of the applicable regulation:  "An employee will not be considered to be 'on a salary basis' if deductions from his predetermined compensation are made for absences occasioned by the employer or the operating requirements of the business." <u>Id.</u> at 55 (citing previous 29 C.F.R. § 541.118(a)(1), which corresponds to present 29 C.F.R. § 541.602(a)).  The Court interpreted this language as referring to "deductions from pay, as opposed to employee benefit accounts" and because the plaintiffs were required to take

vacation (an employee benefit) rather than having their pay deducted, during plant shutdowns, the Court concluded that such a policy did not impact the employees' exempt status. Id.; accord Leslie v. Ingalls Shipbuilding, 899 F. Supp. 1578, 1581 (S.D. Miss. 1995).

This Court agrees with the approach used by the District of Connecticut, in Cooke. Because the applicable regulations refer to "deductions from pay, as opposed to employee benefit accounts" and because the Plaintiffs were required to take vacation (an employee benefit) rather than having their pay deducted, during plant shutdowns, the Court concludes that the Defendant's policy regarding vacations during plant shutdowns does not impact the employees' status as overtime exempt employees.

> b.  Whether Guaranteed Base Compensation Must (and Does) Bear "Reasonable Relationship" to Actual Weekly Compensation
>
> i.  Statutes of Limitations and Plaintiffs' Compensation

At this juncture, the Court finds it necessary to address the issue of the federal and state statutes of limitations. The limitations period for the Plaintiffs' federal claim is two years. 29 U.S.C. § 255(a). Thus, if the Court concludes that Behr violated the FLSA, the Plaintiffs will be able to recover any otherwise compensable and unpaid overtime wages commencing two years before they filed

suit in federal court, on April 11, 2007.  In resolving the FLSA claims, therefore, the Court must look only to salary figures from and after April 11, 2005.  As explained in Section I ("Facts"), *supra*, from and after April 11, 2005, Behr paid all three Plaintiffs straight salaries, with no overtime compensation. Doc. #33, Ex. A (Stephenson Aff.) ¶ 16 (Stephenson is Behr's Human Resources Director).

As to the state law claims, the limitations period is, likewise, two years.[10] Ohio Rev. Code Ann. § 2305.11(A).  However, that period is tied to the date the Plaintiffs filed suit in state court (January 27, 2005),[11] rather than in federal court, given the operation of Ohio's savings statute. Ohio Rev. Code Ann. §2305.19(A).[12] Thus, in resolving the OMFWSA claims, the Court will look to salary figures from

_____

[10]This is one of the "novel" questions the Defendant asserted as a reason for this Court to decline supplemental jurisdiction, as noted *supra*.  The Plaintiffs concede that the newly-enacted Code provision (O.R.C. § 4111.14(K)), which provides for a three year statute of limitations, does not apply to this case and the Court sees nothing in that provision to indicate otherwise.

[11]See Doc. #33, Ex. B (state court complaint).

[12]According to the Ohio savings statute,

In any action that is commenced . . ., if in due time . . . the plaintiff fails otherwise than upon the merits, the plaintiff . . . may commence a new action within one year after . . . the plaintiff's failure otherwise than upon the merits or within the period of the original applicable statute of limitations, whichever occurs later. . . .

Ohio Rev. Code Ann. § 2305.19(A).  Ohio courts have held that a voluntary dismissal, pursuant to Ohio Civil Rule 41(A), constitutes a "failure otherwise than upon the merits" within the meaning of R.C. § 2305.19. E.g., Payton v. Rehberg, 119 Ohio App. 3d 183, 191, 694 N.E.2d 1379 (Ohio 8th App. Dist. 1997).

and after January 27, 2003.[13]

As explained in Section I ("Facts"), *supra*, from and after January 2003, Cromer received straight compensation, with no additional overtime payments. In January 2003, Haas's base compensation was $59,947 and Shock's was $83,586. As Job Level 2 supervisors, both Haas and Shock continued to receive overtime payments throughout 2003, in addition to their base compensation - - Haas receiving $18,747 and Shock receiving $27,525. By April 2004, however, Behr had converted both Haas and Shock to the straight annualized compensation system, with no additional payments for overtime.

In sum, then, in resolving the state law claims, the Court notes that from and after January 2003, Behr paid Cromer a straight salary, with no overtime compensation. Between January 2003-April 2004, it paid Haas an annual salary of approximately $59,947 plus $18,747 additional in overtime pay, for a total of $78,694, while paying Shock $83,586 plus $27,525 in overtime pay, for a total of $111,111. Beginning in April 2004, Haas and Shock received straight salaries, with no overtime pay.

---

[13]The Plaintiffs seek the award of overtime payments from the date such payments ceased. They have not challenged the amount of overtime payments made to them prior to the complete cessation of such payments. Thus, even though the state statute of limitations period reaches back as far as January 2003, some of the Plaintiffs' claims do not actually commence until Behr ceased making overtime payments to them at a later date (both Shock's and Haas's overtime payments stopped in April 2004).

ii.     <u>Provisions of Applicable Regulations</u>

The Plaintiffs do not argue that the general "salary basis" provisions, as set forth above, do not apply in this case. 29 C.F.R. § 541.602(a) (requiring, for example, that employees regularly receive each pay period a predetermined amount constituting all or part of the employee's compensation).  Instead, they argue that their base compensations do not bear a "reasonable relationship" to the amount of compensation they actually took home, which included substantial overtime pay.

As just noted, however, none of the Plaintiffs received any overtime compensation during the FLSA claim period.  Because the Plaintiffs' argument is not relevant to their federal claims and since they "regularly receive[d] each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed," in accordance with 29 C.F.R. § 541.602, they were paid on a "salary basis" for purposes of the FLSA claims.

As to the state law claim, Cromer never received any overtime compensation during the longer OMFWSA claim period.  Therefore, as with the federal claim, the Plaintiffs' argument has no merit as to Cromer's claim under state law and the Court will consider Cromer to have been paid on a "salary basis" for purposes of his OMFWSA claim.  In contrast, Haas and Shock received overtime pay during part of the OMFWSA claim period.  Thus, the Court will now turn its attention to

28

the parties' arguments, as to these two employees.

Along with the basic salary requirements provision, as highlighted above, the regulations also contain a section entitled "Minimum Guarantee Plus Extras." 29 C.F.R. § 541.604. Paragraph (a) of this section provides that "[a]n employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). And further, "the exemption is not lost if an exempt employee who is guaranteed at least $455 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis) . . . ." Id. Thus, receiving additional compensation for work in excess of a normal work week does not, in general, jeopardize an employee's salaried status. Id.; see also Michigan Ass'n of Govn. Employees. v. Michigan Dep't of Corrections, 992 F.2d 82, 84 n.3 (6th Cir. 1993).

The Plaintiffs argue that there is an additional requirement that, in order for their pay to be "on a salary basis", there must be a "reasonable relationship" between their guaranteed compensation and their actual usual take-home pay, including overtime compensation. The Plaintiffs point to case law that pre-dates the promulgation of 29 C.F.R. § 541.604, in support of their argument, but the Court finds that the terms of § 541.604 necessarily guide its resolution of this

question, since that regulation has been in effect throughout the time period in which Haas and Shock claim that Behr improperly withheld overtime compensation from them.[14]

The "reasonable relationship" requirement of 29 C.F.R. § 541.604 is contained in paragraph (b) and reads, in part, as follows:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.  The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek.

29 C.F.R. § 541.604(b) (emphasis added).  That paragraph goes on to provide the following example: "an exempt employee guaranteed compensation of at least $500 for any week in which the employee performs any work, and who normally works four or five shifts each week, may be paid $150 per shift without violating the salary basis requirement."  Id.  A breakdown of the wages provided in this

---

[14] 29 C.F.R. § 541.604 took effect in April, 2004, which is the month Behr stopped paying overtime to the level 2 supervisors.  Both of the cases upon which the Plaintiffs rely (Michigan Ass'n of Govn. Employees. v. Michigan Dep't of Corr., 992 F.2d 82, 84 n.3 (6th Cir. 1993) and Borda v. Sandusky Ltd., 166 Ohio App. 3d 318, 323-34, 850 N.E.2d 766 (Ohio 6th App. Dist. 2006)) grounded their reasoning on an earlier Third Circuit case, Brock v. The Claridge Hotel and Casino, 846 F.2d 180 (3rd Cir. 1988), which imposed a "reasonable relationship" requirement.  The Secretary of Labor promulgated the new regulations with Brock in mind. 69 Fed. Reg. 22122, 22183 (noting, with favor, that courts have "upheld the reasonable relationship requirement" and citing Brock, 846 F.2d 180).

example indicates that an employee with a guaranteed compensation of $500 who actually earns between $600 (four shifts) and $750 (five shifts) will still be considered to be paid on a "salary basis".  Stated another way, an employee whose guaranteed compensation is between 83% ($500 ÷ $600) and 67% ($500 ÷ $750) of what he actually earns is still exempt from the overtime rules.

The Defendant argues that this provision is not applicable to the present case, because the Plaintiffs are not paid on an "hourly, daily or shift basis."  The Plaintiffs counter that their overtime pay was calculated on an hourly basis, so the provision does apply.  The Court finds, however, that the example provided in the regulations is sufficiently similar to the facts in the present case to indicate that there was a "reasonable relationship" between the amount guaranteed to Haas and Shock and the amount they actually earned.  Both men's guaranteed compensation was approximately 75% of what they actually earned.[15]  Given the guidance provided in the regulations, this is well within what the regulations deem to be a "reasonable relationship".  Thus, the Court concludes that the Plaintiffs' argument is without merit and Haas and Shock, like Cromer, were paid on a "salary basis" at all times after January 2003, for purposes of their OMFWSA claims.

c.    Whether Habitual Earning of Overtime Pay is Inconsistent with Salary Basis Determination

[15]In 2003, Haas's base compensation of $59,947 was 76% of his total compensation of $78,694, while Shock's base compensation of $83,586 was 75% of his total compensation of $111,111.

The Plaintiffs' final argument, as to their salaries, is that Haas and Shock always worked in excess of forty hours per week, thereby always earning overtime pay, and, therefore, their compensation directly corresponded to the number of hours they worked, which is inconsistent with a "salary basis" determination. In support of this argument, they cite Acs v. Detroit Edison Co., 444 F.3d 763 (6th Cir. 2006) and Borda v. Sandusky Ltd., 166 Ohio App. 3d 318, 850 N.E.2d 766, 850 N.E.2d 766 (Ohio 6th App. Dist. 2006).

Acs v. Detroit Edison Co. is not supportive of the Plaintiffs' argument. In that case, the Sixth Circuit recognized that "an employer may satisfy the salary-basis test even though it chooses to pay salaried employees on an hourly basis." Acs, 444 F.3d at 768. The Court further recognized that paying employees an "hourly" rate for hours worked over a normal 40-hour workweek did not violate the salary basis test. Id. The Court's primary focus in that case was not on employees who made in excess of their guaranteed compensation, but was, instead, on whether paying an employee less than his guaranteed compensation, as a result of time-entry errors or omissions, ran afoul of the salary basis rules. Id. at 770-71 (concluding that such payments did not violate the salary basis rules).

The Court, likewise, finds that Borda is not supportive of the Plaintiffs' argument. Other than the Ohio Appellate Court's focus on the relationship between the guaranteed minimum compensation and the employee's actual weekly take-home pay, as already addressed, the Borda Court did not make a general

32

finding that employees who always earned overtime pay were not paid on a salary basis.  See 166 Ohio App. 3d 318.  Furthermore, nothing in the pertinent regulations can be read to support the Plaintiffs' argument, on this point.

Therefore, because the Plaintiffs "regularly receive[] each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of [their] compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed," as required by 29 C.F.R. § 541.602, and because none of the exceptions to this rule apply, there is no genuine issue of material fact on this issue, and the Plaintiffs were paid on a "salary basis" for purposes of the FLSA.  The Court will, therefore, proceed to an analysis of the remaining requirements of bona fide executive and administrative employees.

2.    Employees Exempt from Overtime Provisions as "Executives"

Once the salary requirement is met, in order to demonstrate that an employee is exempt as an "executive", the employer must set forth proof that the employee:  (1) has a primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (2) customarily and regularly directs the work of two or more other employees; and (3) has the authority to hire or fire other employees or whose

suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a). For ease of analysis, the Court will begin with the second requirement - - whether the employee customarily and regularly directs the work of two or more other employees, and then turn to an analysis of the other two requirements.

     a.    <u>Whether Plaintiffs Customarily and Regularly Direct Work of Two or More Other Employees</u>

The Defendant points to the following evidence, in support of its contention that the Plaintiffs customarily and regularly direct the work of two or more other employees:

- Cromer's testimony that he supervises in excess of forty employees (Doc. #19, Ex. #11 (Cromer Dep.) at 90-91);

- Shock's testimony that twenty-three employees report to him, including job-setters, operators and "rack" people (Doc. #19, Ex. #3 (Shock Dep.) at 55-56); and

- Haas's testimony that, at various times, between seven and twenty-seven employees have reported to him, including plumbers, electricians, millwrights, machine repairmen and "tinners" (Doc. #19, Ex. #2 (Haas Dep.) at 49, 52, 147).

In response, the Plaintiffs argue that their managers, rather than the Plaintiffs, are in charge of directing the work of the employees that the Plaintiffs "supervise", and point to several portions of the Plaintiffs's Affidavits in support thereof. Doc. #48 (Haas Aff.) ¶¶ 8,17, 24, 25, 31, 35, 39-41; Doc. #49 (Shock Aff.) ¶¶ 29, 35; Doc. #50 (Cromer Aff.) ¶¶ 7, 11, 21, 22.  The cited Affidavits do not support the Plaintiffs's assertions, however.  While they do raise a question as to what extent the Plaintiffs actually "manage" the employees they supervise, that question will be explored in the next step of the analysis.  As to the question presently before the Court, it is sufficient that each of the Plaintiffs has testified that he is responsible for the general supervision of two or more other employees.[16] See Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 502-03 (6th Cir. 2007) (finding it sufficient, for purposes of this step of the FLMA analysis, that plaintiff testified that "she regularly supervised two or more employees" and addressing the extent to which that supervision consisted of management components as part of the "management" step of the analysis).

The Court therefore concludes that there is no genuine issue of material fact as to whether the Plaintiffs customarily and regularly direct the work of two or more other employees.  The Defendant having satisfied two of the four criteria for

---

[16]There is a regulation provision that sets forth the parameters of the phrase "two or more other employees." 29 C.F.R. § 541.104 (providing, for example, that the supervisor must regularly direct the work of two or more other "full-time employees or the equivalent").  Neither party contends that the evidence in the present case does not fall within the confines of this provision, nor does the Court find it to be so.

the "executive" employee exemption from overtime payments (the salary requirement and whether they customarily and regularly direct the work of two or more other employees), the Court now turns to the third criterion - - whether the Plaintiffs have a primary duty of management.

b.    <u>Whether Plaintiffs have Primary Duty of Management</u>

In order to show that an employee is a bona fide executive, the employer must set forth proof that the employee has a "<u>primary duty</u> [of] <u>management</u> of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2) (emphasis added). The dispute between the parties, on this prong of the test, is whether the Plaintiffs have a "primary duty of management". Thus, the Court will turn its focus to the definition of these terms.

The regulations define "primary duty" to mean "the principal, main, major or most important duty that the employee performs" and instruct that the determination of an employee's "primary duty" must be based on "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

As to the word "management", the regulations provide that, in general, "management" includes, but is not limited to, activities such as the following:

- interviewing, selecting, and training of employees;

- setting and adjusting their rates of pay and hours of work;

- directing the work of employees;

- maintaining production or sales records for use in supervision or control;

- appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status;

- handling employee complaints and grievances;

- disciplining employees;

- planning the work;

- determining the techniques to be used;

- apportioning the work among the employees;

- determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold;

- controlling the flow and distribution of materials or merchandise and supplies;

- providing for the safety and security of the employees or the property;

- planning and controlling the budget; and

- monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The inquiry into whether the Plaintiffs have a "primary duty of management" is a fact intensive one.[17]  In order to structure the analysis, the Court will first determine what "management" tasks each of the Plaintiffs perform and then determine if these tasks comprise the Plaintiffs' "primary duties", looking first at

_____

[17]The Court puts no weight on the fact that the Plaintiffs' titles are "supervisors."  As the regulations note, "[a] job title alone is insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2.

the two production supervisors - - Cromer and Shock - - and then at the maintenance supervisor, Haas.

As an over-arching emphasis to their argument on this prong, the Defendant points out that the collective bargaining agreement with the local union prohibits all three of the Plaintiffs from engaging in bargaining unit work, except in emergency situations or for training purposes. Doc. #19, Ex. #27 (Coll. Barg. Agree. Excerpt) at 230 ("It is the express policy of the Corporation that supervisory personnel are for the purpose of carrying out supervisory functions and are not expected to displace employees covered by the [collective bargaining agreement]."[18]).

---

[18]The full text of the collective bargaining agreement, in pertinent part, reads as follows:

It is the express policy of the Corporation that supervisory personnel are for the purpose of carrying out supervisory functions and are not expected to displace employees covered by the Agreement between our Corporation and Local No. 775, IUE-AFL-CIO.

However, both parties recognize that occasions will arise which require that supervisory personnel perform certain work in the interest of orderly and efficient operation. In the past there has been considerable misunderstanding under what circumstances supervisory personnel may properly perform such work.

Generally, this work would include cases of emergency, the failure, inability or refusal of employees to do the particular work, unforeseen circumstances that call for prompt action to avoid damage to plant or equipment or for purposes of instruction or training.

Doc. #19, Ex. #27.

Behr argues that the following facts, relating to the factors set forth in 29

C.F.R. § 541.102, demonstrate that, as production supervisors, Cromer and Shock

perform multiple "management" functions:[19]

---

[19]The Court has only set forth facts for which contrary, admissible evidence has not been presented.  The Plaintiffs have attempted to contradict some of their deposition testimony by affidavit, which is an impermissible means to create a genuine issue of material fact.  Penny v. UPS, 128 F.3d 408, 415 (6th Cir. 1997) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.").  For example, at his deposition, Shock testified as follows regarding his involvement in assigning overtime work to his employees:

Q.  So they might claim you should have - -
A.  They might say, hey you should have called me in for overtime.
Q.  And you are saying I –
A.  I'm saying I don't have to call you in for overtime.
Q.  I used my judgment?
A.  I used my judgment.  I didn't need to call you in. . . .

A.  Yes.  If I thought that I needed to work overtime, then I would work overtime.  That would be -- I try not to work over -- any overtime at all.  I'll shut something down before I'll work overtime unless management comes to me and says, Fred, we have to run all twenty-two machines.  You need to work people over and in to cover those jobs.
Q.  And the reason you avoid it is because of cost to the operation?
A.  Because of cost to the operation.  There's a lot of things that you [have] a high bank level on that you can afford to shut down.  That's why we have a priority list.
Q.  Are there times even when management hasn't come to you and said everything needs to run where you decide nevertheless that some overtime is going to be needed?
A.  That could happen.

Doc. #19, Ex. #3 (Shock Dep.) at 138-41.  Later, in his Affidavit, Shock testified as follows:  "I exercise no authority, judgment, or discretion when it comes to

- <u>Training</u>.  Train newly-hired probationary employees and audit, maintain and ensure all employees comply with work standards for particular jobs.[20] Doc. #19, Ex. #11 (Cromer Dep.) at 104, 215-16; Doc. #19, Ex. #3 (Shock Dep.) at 132.

- <u>Safety</u>.  Send employees under their supervision out for drug tests, if their performance indicates such a need; impose discipline for safety violations, to include verbal and written warnings and temporary suspensions. Doc. #19, Ex. #3 (Shock Dep.) at 113-14, 126-28, 136-37; Doc. #19, Ex. #11 (Cromer Dep.) at 150-52.  Perform periodic safety audits on equipment to ensure their employees have properly used them; conduct investigations of all accidents involving injuries to assigned personnel; give monthly safety talks. Doc. #19, Ex. #3 (Shock Dep.) at 162-63, 185-94; Doc. #19, Ex. #11 (Cromer Dep.) at 255; Doc. #21, Ex. #30 (log of safety talks performed by Cromer).

- <u>Disciplining and Directing/Apportioning the Work of Employees</u>.  Determine how many workers to assign to different tasks in order to accomplish production assignments; determine which jobs to give priority, in certain situations. Doc. #19, Ex. #3 (Shock Dep.) at 106-07; Doc. #19, Ex. #11 (Cromer Dep.) at 117-18.  Shift workers to different tasks, depending on availability of machinery and products. Doc. #19, Ex. #3 (Shock Dep.) at 82-83; Doc. #19, Ex. #11 (Cromer Dep.) at 125-26, 137-38.  Identify and react to work quality issues. Doc. #19, Ex. #3 (Shock Dep.) at 83, 132; Doc. #19, Ex. #11 (Cromer Dep.) at 217.  Counsel subordinates; issue warnings and suspensions for inferior work performance and failure to follow    supervisor directions, sometimes in accordance with directives from upper level management or human resources. Doc. #19, Ex. #3 (Shock Dep.) at 121-24; Doc. #19, Ex. #11 (Cromer Dep.) at 257-61; Doc. #21, Ex. #42 (Suspension

_____

assigning overtime.  Someone else determines if employees are going to work over the weekend." Doc. #49 (Shock Aff.) ¶ 32.

[20]As previously stated, the Court is not required to "wade through and search the entire record" for facts to support the parties' positions.  Both parties, at times, struggle with providing accurate cites to support their assertions.  For example, the Defendant points broadly to attachments without directing the Court's attention to specific pages or paragraphs, which is an improper means of offering support for a stated premise. <u>E.g.</u>, Doc. #67 at 28 (citing generally to Exhibit #64, which is comprised of 31 pages of email communications, in support of its contention that the Plaintiffs have various training obligations).

Reports, completed by Cromer); Doc. #21, Ex. #43 (Supervisor's Reports, completed by Shock).  Ensure overtime assignments are properly made, in accordance with union requirements.[21] Doc. #19, Ex. #3 (Shock Dep.) at 138-39, 172; Doc. #19, Ex. #11 (Cromer Dep.) at 211-15.  Determine whether productivity demands necessitate overtime work, while balancing budget considerations. Doc. #19, Ex. #3 (Shock Dep.) at 139-41; Doc. #19, Ex. #11 (Cromer Dep.) at 154-55, 211-15.  Complete employee pay adjustment forms. Doc. #19, Ex. #3 (Shock Dep.) at 213-15.

- <u>Handling Employee Complaints and Grievances</u>.  Address employees' concerns one-on-one with employees, attempting to resolve grievances, as first step in formal grievance process.[22] Doc. #19, Ex. #3 (Shock Dep.) at

---

[21]The Plaintiffs properly point out that supervisors are restricted in their selection of which employees are offered overtime opportunities by labor relations requirements.  However, both the Plaintiffs' deposition testimony and the Overtime Supervisors' Equalization Training Policy, to which the Plaintiffs cite, Doc. #68, Ex. #84 (Supervisor Training Program), indicate that Behr entrusts its supervisors to be the gatekeepers in making sure employees are selected for overtime, in compliance with multiple labor relations considerations.

[22]In his deposition, Shock explains that a grieving employee typically chooses to skip the first step of the formal grievance process and go directly to the second step - - contacting his or her union steward, at which time the supervisor is no longer allowed to discuss the issue with the employee. Doc. #19, Ex. #3 (Shock Dep.) at 194-96.  Nevertheless, Shock admitted that he plays a role in the full process, as it is supposed to and sometimes does operate, as the following testimony indicates:

Q.    Do you understand what the first step is under the grievance procedure?
A.    Yes.
Q.    That would be a discussion between the grievant and you about what the issue is and how it might be resolved?
A.    Yes.
       . . .

194-96.

- **Maintaining Production Records**.  Record operational effectiveness data and coordinate with other supervisors, as to equipment downtime and production issues. Doc. #19, Ex. #3 (Shock Dep.) at 89-90, 156; 139-41; Doc. #19, Ex. #11 (Cromer Dep.) at 160-61.

- **Appraising Employees' Productivity and Efficiency**.  Report substandard performance of probationary employees to personnel department. Doc. #19, Ex. #11 (Cromer Dep.) at 102-04; <u>see also</u> Doc. #19, Ex. #3 (Shock Dep.) at 132 (indicating "constant" monitoring of work efficiency of probationary employees).  For non-probationary employees, if productivity numbers indicate that employee is not performing to standard, work with the employee to attempt to correct performance problems. Doc. #19, Ex. #11 (Cromer Dep.) at 108-09.  Ensure employees maintain and comply with company work standards (quality control). Doc. #19, Ex. #3 (Shock Dep.) at 192-94 (indicating he has to audit 25% of his employees per quarter and that he has the discretion to choose which ones to audit); Doc. #19, Ex. #11 (Cromer Dep.) at 215-17.

- **Determining Techniques to be Used**.  Assess and monitor inventories of parts

---

> Q.	Okay, but I gather [it has] occurred that you have had first step meetings?
> A.	I've had first step meetings.  Usually first step meetings, we solve the grievances.

Id. at 195-96.  Later in his affidavit, Shock provided contradictory testimony, as follows:

> My responsibility with respect to grievances consists of completing a portion of the grievance form and forwarding the grievance form to HR.  Though I am indicated as "Mgt. Rep." on the grievance forms involving my shift, the answers to the grievances are always provided by a HR management representative.  My role is to make a notation on the grievance form as to the nature of the grievance.  I am not permitted to exercise judgment, authority, or discretion as to the resolution of the grievance.  HR never asks for my input as to how a grievance should be answered.

Doc. #49 (Shock Aff.) ¶ 34.

42

to determine if production schedule changes are warranted based on part availability; develop corrective action plan if a press malfunctions; decide whether to shut down a press, change a mold or temporarily move employees, if quality issues arise; monitor daily production, in order to determine whether to re-align people or parts to meet production goals. Doc. #21, Ex. #26 (Baldino Dec.) ¶ 6 (Baldino is Shock's manager); see also Doc. #21, Ex. #25 (Homan Dec.) ¶ 7 (Homan is Cromer's manager).

- Planning and Controlling Budget. While not responsible for preparing budgets, production supervisors are required to make production decisions (e.g., to decide whether to scrap or repair a defective part) and staffing decisions (deciding when to schedule overtime work) to stay within assigned budgets for their areas and are evaluated on the same. Doc. #21, Ex. #25 (Homan Dec.) ¶ 7 at 5; see also Doc. #21, Ex. #26 (Baldino Dec.) ¶ 6 at 4 (indicating that Shock is expected to plan within his assigned budget by controlling production and manpower costs).

In response, the Plaintiffs argue that many of these tasks should not be given much weight, because their ability to exercise discretion and judgment when executing the tasks is limited by the requirement that they follow both Behr's Standard Work Instructions and the terms of the collective bargaining agreement. Doc. #49 (Shock Aff.) ¶ 32 (overtime assignments made in accordance with terms of collective bargaining agreement); Doc. #50 (Cromer Aff.) ¶ 4 ("As a level three production supervisor, my primary responsibility is to follow the Standard Work Instruction.").

Other courts that have addressed this argument have found it to be without merit for several reasons, and this Court agrees. E.g., Rainey v. McWane, Inc., 552 F. Supp. 2d 626 (E.D. Tex. 2008) (finding that although production supervisors could not directly discipline employees, they "played an important role in the

employee discipline process" by initiating that process when they noted infractions; concluding that, although plaintiffs had to get permission to get additional help in their units, the fact that they were still responsible for identifying the need for

additional help in order to meet their production goals was indicative of managerial status).

For example, the plaintiff production supervisor in <u>Beauchamp v. Flex-N-Gate LLC</u>, 357 F. Supp. 2d 1010 ( E.D. Mich. 2005), argued that his production oversight functions were constrained by automotive industry standards and guidelines (similar to Behr's Standard Work Instructions) and his ability to impose discipline was limited by the terms of a collective bargaining agreement. <u>Beauchamp</u>, 357 F. Supp. 2d at 1017. The Court rejected these arguments noting that "nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive'" and, because the supervisors were responsible for training workers to perform in accordance with the work standards and to ensure compliance thereto, their tasks were sufficiently managerial. <u>Id.</u> ("[I]t is not enough merely to propagate standards -- rather, supervision is necessary so long as a company must rely on human workers to carry out these standards."). Furthermore, the Court pointed out that, unlike the regulations governing workers who are exempt as "administrative" employees, the "executive" employee provisions contain "no analogous requirement that these duties entail the exercise of discretion or independent judgment." <u>Id.</u> at 1018; <u>compare</u> 29 C.F.R. § 541.200 (noting that one requirement for "administrative" exemption is that employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance"). Rather, the focus for employees exempt as

45

executives "is on activities typically associated with management or supervision." Beauchamp, 357 F. Supp. 2d at 1018.

Similarly, the Court in this case finds that the tasks identified above are "management" tasks, in that they line up with the tasks identified as such by the pertinent regulations (29 C.F.R. § 541.102) and are activities typically associated with management or supervision. Furthermore, the Court is not swayed by the fact that the Plaintiffs' actions are sometimes constrained by the dictates of Behr's Standard Work Instructions or the terms of the collective bargaining agreement, for the reasons articulated by Judge Rosen, in Beauchamp. The Court also concludes that accepting such an argument would make it virtually impossible for any employer involved in the mass production of goods to satisfy the regulations' "management" criteria, in that most such employers have likely developed similar, stringent production standards, and are almost certainly constrained by union requirements. The Court having highlighted the "management" tasks, or exempt work, performed by Shock and Cromer, it now considers whether this work comprises their "primary duty".

The regulations instruct that in making this determination, courts should consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a). The Sixth

Circuit hones in on the focal point of this consideration in stating that "'[p]rimary duty' does not mean the most time-consuming duty; it instead connotes the 'principal' or 'chief' -- meaning the most important -- duty performed by the employee." Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 504 (6th Cir. 2007) (citing Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982)).

On this point, the Plaintiffs argue that the management duties they perform are only "derivative" or "tangential" to their manual and clerical work,[23] while the Defendant argues that several facts indicate that the management duties performed by the Plaintiffs are their "primary" duties. Principally, it points to the fact that the collective bargaining agreement prohibits the Plaintiffs from performing the "nonexempt" work of producing parts. Moreover, the union recognizes the Plaintiffs as management, as indicated by their designation as the first step of management, in the grievance process. The Defendant also points to numerous cases wherein the plaintiffs carried out management tasks to a similar extent as the Plaintiffs herein and the courts concluded that the plaintiffs' primary duty was management. E.g., Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141 (3d Cir. 1983) (finding that, even though section foremen, as a group, only averaged spending 44% of their time on managerial work, the record revealed sufficient presence of other "pertinent factors" to demonstrate that each foreman had

---

[23]The Plaintiffs actually argue both that they have no management responsibilities and that they have "only derivative, tangential responsibilities of this sort," but devote the bulk of their memoranda focusing on how little time they spend on management related duties. See Doc. #74-3 at 18.

management as primary duty); <u>Rainey v. McWane, Inc.</u>, 552 F. Supp. 2d 626 (E.D. Tex. 2008) (finding that production supervisors who supervised unionized manual laborers working various jobs in the manufacturing of iron pipe and couplings were exempt as "executives"); <u>Beauchamp v. Flex-N-Gate LLC</u>, 357 F. Supp. 2d 1010 ( E.D. Mich. 2005) (finding that production supervisor at business that supplied parts to automotive assembly plants was exempt as "executive"); <u>Christiansen v. U.S. Gypsum Co.</u>, 66 F. Supp. 835 (N.D. Ohio 1946) (determining that manual work performed by plaintiff was "incidental to his chief occupation as Maintenance Foreman, and was performed by him, not through compulsion, or because such labor was designated by his superiors as a necessary part of his employment, but because he chose to undertake it").

The Plaintiffs argue that Shock and Cromer spend a substantial amount of their time performing menial tasks such as counting parts and doing paperwork, rather than the management functions outlined above.[24] Doc. #45-2 at 40 (citing Doc. #49 (Shock Aff.) ¶¶ 9, 10, 12, 15; Doc. #50 (Cromer Aff.) ¶¶ 4, 8.  The Defendant counters by pointing out that time alone is not the sole determiner of an employee's primary duty; rather, that determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's

---

[24]Shock testifies that he spends three hours every shift counting parts and about 90 minutes "on administrative office work, such as attendance." Doc. #49 (Shock Aff.) ¶¶ 9, 12.  Cromer does not testify to specific amounts of time devoted to these sorts of tasks, but instead states that he spends "a substantial amount of [his] time counting parts." Doc. #50 (Cromer Aff.) ¶ 4.

job as a whole." 29 C.F.R. § 541.700(a).  Furthermore, the Defendant asserts that

the task the Plaintiffs refer to as "counting parts" is actually an inherent part of the

supervisors' responsibility to manage their production volumes, enabling them to

track whether their sections have satisfied their daily production quotas and

whether they should shift production from one part to another. Doc. #68, Ex. #58

(Stephenson Supp. Dec.) ¶ 14.  Furthermore, supervisors are responsible for the

continuing supervision of their areas while inventorying parts. Id.; see also Doc.

#19, Ex. #3 (Shock Dep.)  at 137 (testifying that he is "constantly in the

department" and that "throughout the entire shift, I'm constantly visible to my

people so they know that Fred's out here").[25]

    As noted above, the regulations state that, in making the determination of

whether management tasks comprise a plaintiff's primary (principal, main, major or

most important) duty, courts should consider the relative importance of the

employees' management duties as compared with their other duties, the amount of

time spent on management duties, the employees' relative freedom from direct

supervision, and the relationship between the employees' salaries and the wages

---

[25]The Court has experienced considerable frustration in reviewing the voluminous evidentiary materials referred to in the parties' briefings.  For example, both parties refer to the plaintiffs' self-evaluation forms, which purport to identify a number of management-related responsibilities.  The Court has been unable to locate these forms, however. See e.g., Doc. #67 at 8-9 (Defendant relying on self-evaluation forms, which are supposedly filed as Exhibit 57, but no such exhibit has been filed with the Court); Doc. #74-3 at 22 (Plaintiffs referring to the self-evaluation forms by Bates-stamp numbers (e.g., Behr-USDC 013129), without pointing out where the forms are located).

paid to other employees who perform the same kinds of non-managerial work

performed by the supervisor. 29 C.F.R. § 541.700(a)[26]; see also Thomas v.

Speedway SuperAmerica, LLC, 506 F.3d 496, 504 (6th Cir. 2007) (wherein the

Appellate Court compares previous 29 C.F.R. § 541.103 (2003) ("[P]rimary duty

means the major part, or over 50 percent, of the employee's time") with current 29

C.F.R. § 541.700(a) (2007) ("'[P]rimary duty' means the principal, main, major[,] or

---

[26] Specifically as to the amount of time spent performing exempt work, the regulations provide as follows:

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700(b). The regulations continue with the following example, to illuminate the operation of § 541.700:

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

most important duty that the employee performs")).

The Court finds that Shock's and Cromer's primary duty is management. The facts clearly indicate that the relative importance of the production supervisors' management duties (training probationary employees, safety, discipline, directing the work of employees, participation in grievance process, tracking operational effectiveness data, coordinating production issues with other supervisors, appraising employee productivity and efficiency, determining production techniques to be used, and being held accountable for area budget considerations) far outweighs the importance of their non-management duties (counting parts,[27] miscellaneous clerical work). As to the time spent on these duties, the record indicates that while the production supervisors might have other non-management responsibilities, they remain in the supervisory mode while performing such other functions. Further, while the Plaintiffs' actions are constrained by the dictates of Behr's Standard Work Instructions and the collective bargaining agreement, there is no indication that the supervisors do not enjoy unfettered control over the areas for which they have been given responsibility, within the parameters of those guidelines, such that their primary duty is to act as the first line of management for the employees under their supervision. There being no genuine issue of material fact, as to the primary duty of Shock and Cromer, the Court now turns to a

---

[27]To the extent that the Plaintiffs' efforts can be characterized as simply doing the menial task of "counting parts", rather than being characterized as the Defendant would have the Court do, as an inherent part of the supervisors' responsibility to manage their production volumes.

51

determination of whether Haas's primary duty was management.

ii.    Whether Haas had Primary Duty of Management

Behr argues that the following facts, relative to the factors laid out in 29

C.F.R. § 541.102, demonstrate that, as a maintenance supervisor, Haas performs

multiple "management" functions:

- Training.  Ultimately responsible for training of apprentices working in his area, in that he directs the journeymen who are assigned to train the apprentices. Doc. #19, Ex. #2 (Haas Dep.) at 53-58.

- Safety.  Leads monthly safety meetings; routinely audits and inspects equipment and personnel, in his assigned area, for compliance with safety requirements. Doc. #19, Ex. #2 (Haas Dep.) at 202, 234-35; Doc. #21, Ex. #44 (Bonwell Dec.) at 6, ¶ 6.  Documents and investigates injuries sustained by his employees. Doc. #19, Ex. #2 (Haas Dep.) at 230-32; Doc. #21, Ex. #53 (Supervisor's Invest. Reports).

- Disciplining and Directing/Apportioning the Work of Employees.  Supervises and leads hourly skilled trades and production workers, assigning tasks and preparing performance reviews.  Doc. #48, Ex. 4 (Haas Resume) at 1. Works closely with other maintenance and production supervisors and engineers to coordinate work schedules and preventive maintenance schedules, in order to minimize downtime. Id.; Doc. #19, Ex. #2 (Haas Dep.) at 143-44, 196. Directs work of both apprentices and journeymen, in training of apprentices. Doc. #19, Ex. #2 (Haas Dep.) at 53-58.  Requests additional staffing from other work groups, based on work load demands. Id. at 136-37.  Assesses maintenance needs and assigns appropriate skilled trade workers to repair and maintain equipment.[28] Id. at 151-52; Doc. #21, Ex. #44 (Bonwell Dec.)

_____

[28]The Plaintiffs argue that maintenance supervisors do not have any more authority than hourly bargaining unit work team coordinators when it comes to making job assignments.  Because they cite to a document that they do not provide a means for the Court to locate in support of this assertion, the Court will not consider it in ruling herein. Doc. #74-3 at 17 (citing BEHR-USDC 006809).

at 3-4, ¶ 6. Implements discipline, in accordance with company policy and collective bargaining agreement guidelines. Doc. #21, Ex. #44 (Bonwell Dec.) at 4, ¶ 6. Has authority to evaluate and, if appropriate, terminate probationary employees. Id. at 5, ¶ 6. Schedules and allocates overtime work for hourly employees, within budget and in manner that complies with bargaining agreement. Id.; Doc. #19, Ex. #2 (Haas Dep.) at 167-68.

- Handling Employee Complaints and Grievances. Serves as first level "management representative" in union grievance process. Doc. #21, Ex. #44 (Bonwell Dec.) at 5, ¶ 6; Doc. #21, Ex. #54 (grievance naming Haas as mngt. rep.).

- Maintaining Maintenance Records. Requests parts for equipment repairs. Doc. #19, Ex. #2 (Haas Dep.) at 98-99. Prepares "carry over" reports at end of shift regarding ongoing maintenance issues. See Doc. #21, Ex. #44, Ex. D (Haas was reprimanded for failing to complete such a report).

- Appraising Employees' Productivity and Efficiency. Regularly inspects work done by his employees; signs off on employees' daily maintenance assignments. Doc. #19, Ex. #2 (Haas Dep.) at 85-88.

- Determining Techniques to be Used. Planned layout and design and oversaw installation and maintenance of new product lines and new machinery and equipment. Doc. #48, Ex. 4 (Haas Resume) at 1. Responsible for all aspects of preventive/predictive maintenance programs for all plant equipment. Id. Determines types of parts and tools needed to make repairs and makes sure they are available. Doc. #21, Ex. #44 (Bonwell Dec.) at 4, ¶ 6.

- Planning and Controlling Budget. Works closely with other supervisors and engineers to coordinate work schedules and preventative maintenance schedules, so as to keep within the budget. Doc. #48, Ex. 4 (Haas Resume) at 1. Evaluated on how well his area performs with regard to budget (although he is not aware of what the budget is). Doc. #19, Ex. #2 (Haas Dep.) at 102-05.

As noted above with regard to Cromer and Shock, the Plaintiffs argue that

many of these tasks should not be given much weight, because Haas's ability to

exercise discretion and judgment when executing the tasks is limited by the requirement that he follow both Behr's Standard Work Instructions and the terms of the collective bargaining agreement. For all the reasons highlighted, *supra*, Section III(B)(2)(b)(i), in the discussion pertaining to Cromer and Shock, however, the Court concludes that Haas's tasks identified above are "management" tasks.

The Court having highlighted the "management" tasks, or exempt work, performed by Haas, it now considers whether this work comprises his "primary duty". As noted above, in making this determination, the Court must consider the relative importance of Haas's management duties as compared with his other duties, the amount of time spent on management duties, Haas's relative freedom from direct supervision, and the relationship between Haas's salary and the wages paid to other employees who perform the same kinds of non-managerial work performed by the supervisor.[29] 29 C.F.R. § 541.700(a).

As with Cromer and Shock, as evidence that Haas's primary duty is management, the Defendant points to the fact that the collective bargaining agreement precludes Haas from engaging in manual labor and that he is recognized by the union as management. In response, the Plaintiffs' argument centers on

---

[29]The Plaintiffs suggest that Haas was paid six cents per hour less than his bargaining unit coworkers, in 2007 (Doc. #74-3 at 19 n.8), but point to unsupportive evidence in support of this assertion. See Doc. #74, Attach. #3 (Haas Supp. Aff.) ¶¶ 3, 5 (Haas's testimony supports the assertions about his own salary). But see Doc. #33, Ex. A (Stephenson Aff.) ¶ 5; Doc. #68, Ex. #58 (Stephenson Supp. Dec.) ¶ 5A (Stephenson's testimony does not support the assertions about the average hourly rate of skilled trades employees).

Haas's affidavit testimony, which they offer in support of their contention that Haas "spends 90% of his time working on Behr's equipment, and the rest of his time doing administrative and clerical work." Doc. #45-2 at 40 (citing Doc. #48 (Haas Aff.) ¶¶ 6-7[30]).

The Defendant devotes a considerable portion of its reply brief (14 pages) attempting to demonstrate that this testimony is a "patent falsehood", in that it is contradicted by Haas's previous deposition testimony and by a resume he previously submitted for a new position, as well by the terms of the collective bargaining agreement. Doc. #67 at 15-29. In the interest of judicial economy, the Court will not go into the details of the Defendant's argument, on this point, but instead provides the following encapsulation of the main points therein:

_____

[30]Haas's affidavit testimony, which was rendered in July 2008, reads as follows:

> My primary responsibility is to maintain, diagnos[e] and repair equipment and machinery, including "troubleshooting" equipment breakdowns. Consistent with my background and training, I perform the same type of work as the other skilled trades bargaining unit employees in the Maintenance Department. In fact, I spend approximately ninety percent (90%) of my time on the factory floor, checking, maintaining, and repairing machinery.

> During my shift, you can find me working on a particular repair, or someone has contacted me about a machine malfunctioning. The rest of my time is spent doing preventive maintenance. I spend about 10% of my time doing clerical and administrative work. I am not asked to make management decisions, and I have no discretionary authority to make management decisions.

Doc. #48 (Haas Aff.) ¶¶ 6-7.

- <u>Haas's Deposition</u>.[31]  Haas testified that he spends 90% of his time "on the floor", but that such time includes checking on the jobs that "[his] guys" are doing, inspecting machines, meeting with production supervisors and engineers to evaluate potential job situations, and doing "incidental" maintenance work (e.g., handing a tradesman a wrench or turning off a ball valve, so a tradesman can do his work). Doc. #19, Ex. #2 (Haas Dep.) at 120-25.

- <u>Haas's Resume</u>.[32]  At the outset, Haas represents that he is a "maintenance

---

[31]Haas's deposition was taken on May 11, 2005. Doc. #19, Ex. #2 (Haas Dep.) at 1.

[32]The Plaintiffs attach Haas's resume as an exhibit to his Affidavit. Doc. #48, Ex. 4.  This resume (which had, at that point in time, been subpoenaed from Harley Davidson where Haas had applied for a job, in 2007) was previously the subject of dispute between the parties and was addressed in the Defendant's Motion Regarding Sufficiency of Plaintiffs' Objections and Answers to Requests for Admissions and for Sanctions. Doc. #43.  In its Requests for Admissions, the Defendant asked Haas to "admit that the resume . . . is a true and accurate submission by David Haas to Harley Davidson in support of his application for employment" and if not, to provide details as to how the resume was not true or accurate. Doc. #43, Ex. 1.  The Plaintiffs responded by stating that "[t]his request for admission [is] denied on the grounds that 'Harley Davidson' is a trade name and no such entity exists." Doc. #43, Ex. 2.  In ruling on the Defendant's Motion challenging the sufficiency of this response, among others, Magistrate Merz found that the response did not satisfy Federal Rule of Civil Procedure 36 and, thus, deemed the subject requests admitted. Doc. #66.

Haas recently submitted this same resume when interviewing for a job at John Deere, where he is currently employed. Doc. #48 (Haas Aff.) ¶ 43.  In his Affidavit, Haas attempts to qualify the facts stated in the resume as follows:

> The resume . . . states that I supervise and lead hourly employees, assign tasks, schedule overtime and conduct performance reviews, and these statements are true within the limitations as I have described in this affidavit.  My resume also outlines my extensive tool and die making background and I also reference my ability to set up and operate machine shop tools.  I did not list the percentage of time I devote to each aspect of my job in the resume.

Id.  While it is true that Haas does mention his ability to set up and operate machine tools, the over-arching emphasis of the resume is Haas's vast supervisory

supervisor" and "supervise[s] the skilled trades in the maintenance of the plant equipment." He also states that he "planned the layout and design and over[saw] the installation and maintenance of new product lines and new machinery and equipment from Germany." Under the category of "Skills and Duties", Haas includes the following:

- Currently supervise and lead hourly skilled trades and production workers, assigning tasks, scheduling overtime in a union plant and performance reviews.

- Proficient using SAP maintenance management software.

- Work closely with other maintenance supervisors, production supervisors and engineers to coordinate work schedules and preventative maintenance schedules to minimize downtime and keep within the budget.

- Work jointly with union leadership and union practices.

- Fully capable and able to supervise machining and assembly operations.

- Responsible, as a team member and leader, for all aspects of preventive/predictive maintenance programs for all equipment.

Doc. #48, Ex. 4 (Haas Resume).


- Collective Bargaining Agreement. As previously noted, the collective bargaining agreement provides that "supervisory personnel are for the purpose of carrying out supervisory functions and are not expected to displace employees covered by the [collective bargaining agreement]." Doc. #19, Ex. #27 (Coll. Barg. Agree. Excerpt) at 230. On one occasion, Haas was grieved against for violating this agreement when he held a rubber gasket so a pipefitter could start a screw; the complainant was awarded four hours of straight time, as recompense. Doc. #21, Ex. #28 (Grievance against Haas) ("[M]anagement elected to work 1 pipefitter and Mr. Haas acted as a helper, this action cost me the opportunity to work Sunday . . . . Mr. Haas does not seem to know his role as a supervisor and I demand Labor Relations explain this to him.").


Following the dictate set forth by the Sixth Circuit that "'[p]rimary duty' does not

mean the most time-consuming duty; it instead connotes the 'principal' or 'chief' --

_____

experience, with the reference to hands-on machinery work being mentioned only incidentally. See id.

meaning the most important -- duty performed by the employee," the Court concludes that, just as with Cromer and Shock, Haas's primary duty is management. Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 504 (6th Cir. 2007). The Court finds it troubling that the Plaintiffs attempt to characterize Haas as simply another laborer on the machine shop floor (as stated in their Memorandum in Opposition, "Mr. Haas spends 90% of his time working on Behr's equipment . . . ."), in the face of all of the contrary evidence on the record, including Haas's own representation of himself in his resume, as being primarily a manager.

The Court finds the Plaintiffs' attempt to create a genuine issue of material fact, by providing later affidavit testimony that contradicts earlier deposition testimony, to be equally as troubling. Compare Doc. #19, Ex. #2 (Haas's 2005 Dep.) at 120-25 (testifying that his time "on the floor" includes checking on the jobs that "[his] guys" are doing, inspecting machines, meeting with production supervisors and engineers to evaluate potential job situations, and doing "incidental" maintenance work) with Doc. #48 (Haas's 2008 Aff.) ¶¶ 6-7 ("Consistent with my background and training, I perform the same type of work as the other skilled trades bargaining unit employees in the Maintenance Department."). As previously noted, the Sixth Circuit does not allow a party to create a genuine issue of material fact by submitting affidavit testimony that contradicts earlier deposition testimony. Penny v. UPS, 128 F.3d 408, 415 (6th Cir. 1997).

The Court having found no genuine issue of material fact on the issue of whether the Plaintiffs' primary duty is that of management, it now turns to the final part of the "executive" exemption analysis, to wit:  whether the Plaintiffs have the authority to hire or fire other employees or whether their suggestions on these issues are given particular weight.

        c.    <u>Whether Plaintiffs' Suggestions and Recommendations as to Hiring, Firing, Advancement, Promotion or Other Change of Status of Other Employees are Given Particular Weight</u>

The final consideration in determining whether the Plaintiffs are exempt from the overtime provisions of the FLSA is whether they have the "authority to hire or fire other employees or [whether their] suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4).  In this case, the dispute revolves around whether the Plaintiffs' suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

The regulations provide that Courts should consider the following factors when deciding whether an employee's suggestions and recommendations are given such weight:  "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions

and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. The regulations go on to provide that, generally, "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." Id.

At the onset of its argument on this point, the Defendant correctly points out that the regulations read in the disjunctive. Thus, the Plaintiffs' recommendations need only be given particular weight about one of the listed employment decisions, rather than about all of them.

In support of its Motion, the Defendant argues that the Plaintiffs' suggestions are given particular weight with regard to firing (or retention) of probationary employees, as well as in other change of status decisions, such as suspensions. As support for this assertion, the Defendant points to evidence that indicates that supervisors evaluate the probationary employees assigned to their areas, recommending whether they should be retained, at the end of their probationary cycles and such recommendations are given "ultimate weight." Doc. #21, Ex. #41 (Probationary Employee Appraisal forms, prepared by Cromer, wherein he indicated whether employees should be retained or separated); Doc. #33, Ex. A (Stephenson Aff.) ¶ 33 (Human Resources Director testifying that each

60

production and maintenance supervisor is responsible for recommending whether probationary employees assigned to them should be retained; decision of supervisor given "ultimate weight, subject only to the possibility that labor relations may evaluate whether a provision of the applicable civil rights laws may be implicated"); see also Doc. #19, Ex. #2 (Haas Dep.) at 131-34 (no probationary employees assigned to him have stayed for their full probation cycle since he has been a maintenance supervisor).

The Defendant also points to the Plaintiffs' testimony wherein they state that they have the authority to suspend their employees. Doc. #19, Ex. #3 (Shock Dep.) at 198 (Shock suspended employee for sleeping on the job); Doc. #19, Ex. #11 (Cromer Dep.) at 148-52 (Cromer has authority to temporarily suspend employee for repeated safety violations); 256-58 (Cromer has suspended three employees for various infractions); see also Doc. #19, Ex. #2 (Haas Dep.) at 138-39 (Haas has not been in a position where one of his employees engaged in misconduct sufficient to warrant significant disciplinary action); Doc. #21, Ex. #26 (Baldino Dec.) at 5, ¶ 6 (Haas's manager testifies that Haas has authority to issue "Notice of Suspension, Disciplinary Layoff or Discharge," informing hourly employee of potential suspension or discharge).  As legal support for its argument, the Defendant points to Beauchamp v. Flex-N-Gate LLC, 357 F. Supp. 2d 1010 (E.D. Mich. 2005), as well as other cases from outside the Sixth Circuit.

In response to the Defendant's argument, the Plaintiffs assert generally that

they do not exercise any discretion when it comes to dealing with employees, Doc. #45-2 at 43, and, more specifically, that the Defendant has not produced any documentation supporting its contention that their recommendations are given any weight. Doc. #74-3 at 20 ("Behr has not produced any documented policies or procedures referencing the responsibility of supervisors to make comments or recommendations concerning employees, other than probationary employees. Instead, the only evidence the Defendant puts forth is the unsubstantiated statements of Mr. Stephenson.") (emphasis added). The Plaintiffs point to no legal support for their position.

The Sixth Circuit has not had occasion to interpret and apply the "particular weight" provision of 29 C.F.R. § 541.105. In the absence of Appellate Court guidance, the Court finds the District Court's opinion in Beauchamp v. Flex-N-Gate LLC, *supra*, to be instructive.

In Beauchamp, the company hired new employees through a temporary agency, but the determination of whether the temporary workers would be retained as permanent workers was based on the recommendation of the temporary worker's production supervisor. 357 F. Supp. 2d at 1016. The Court concluded that this practice "comports with the regulatory requirement that an executive's suggestions and recommendations as to hiring 'are given particular weight.'" Id. (citing 29 C.F.R. § 541.100(a)(4); 29 C.F.R. § 541.105).

Similarly, in this case, in accordance with the factors set forth in 29 C.F.R.

§ 541.105, it is the supervisors' job to make recommendations about the retention of every probationary employee that completes a probationary cycle under their supervision and such recommendations are relied upon by upper level management, as evidenced by the Probationary Employee Appraisal forms and the Human Resource Director's unrebutted testimony.  Furthermore, this case presents the additional, unrebutted fact that the supervisors had the power to unilaterally suspend their employees - - demonstrative of an additional way in which their recommendation as to "other change of status of other employees" is given particular weight.  Thus, the Court concludes that there is no genuine issue of material fact as to whether the Plaintiffs' suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.[33]

   The Court having found no genuine issue of material fact as to any of the

---

[33]In making its preliminary decision on the Motions for Partial Summary Judgment (Doc. #75), the Court originally determined that there was a genuine issue of material fact on this prong of the executive exemption test (whether the Plaintiffs' suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight).  The Court made its initial determination based on the lack of Sixth Circuit guidance on the parameters of this prong and also in reliance on the facts, as argued by the Plaintiffs.  A review of Judge Rosen's well-reasoned opinion in Beauchamp v. Flex-N-Gate LLC, 357 F. Supp. 2d 1010 (E.D. Mich. 2005), which is factually indistinguishable from the present case, on this point, and a more in-depth analysis of the facts, as set forth in the record, has made it clear to the Court that there is actually no genuine issue of material fact on this prong of the test, as explained more fully herein.

components of the "executive" FLSA overtime exempt requirement, it finds it unnecessary to resolve the question about whether the Plaintiffs are exempt from the overtime exempt provisions as "administrative" employees.

The Defendant's Motion for Partial Summary Judgment (Doc. #19), as to the federal and state claims against Cromer, Shock and Haas, is SUSTAINED and the Plaintiffs' Motion for Partial Summary Judgment (Doc. #45-2), as to those same Plaintiffs, is OVERRULED.


V.    CONCLUSION

The Defendant's Motion for Partial Summary Judgment (Doc. #19), as to all claims against Cromer, Shock and Haas, is SUSTAINED.  The Defendant's Motion to Dismiss and Motion for Costs (Doc. #33) is OVERRULED.  The Magistrate Judge's Substituted Report and Recommendations (Doc. #39) is respectfully REJECTED; the Plaintiffs' objections thereto (Doc. #40) are SUSTAINED.  The Plaintiffs' Motion for Partial Summary Judgment (Doc. #45-2), as to the claims against Cromer, Shock and Haas, is OVERRULED.

This document is not a final appealable order.

A telephone conference call to discuss further procedures in the captioned cause will be convened, beginning at 8:30 a.m., on Monday, January 5, 2009.

December 22, 2008

  /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT


Copies to:
Counsel of record